UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NILAS THOMPSON, III,

                                     Plaintiff,

        vs.                                           9:08-CV-0965
                                                (FJS/ATB)

SCOTT C. CARLSEN, et al.,

                                     Defendants.

_____

NILAS THOMPSON, III, Plaintiff pro se
JUSTIN C. LEVIN, Ass't Attorney General, for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

      This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge.  On January 4, 2010, the case was re-assigned to me, following the retirement of Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 25).

      In this civil rights complaint (Dkt. No. 1), plaintiff alleges that four named individuals[1] and several "John" or "Jane" "Doe" defendants employed by the New

---

[1] Only two of the named defendants have been served with the complaint–Ulster Superintendent Scott C. Carlsen and Duane Taylor, the Grievance Program Supervisor at Ulster. The U.S. Marshal Service was unsuccessful in serving "Scotty Rock" or "Ms. Sarkowski," whom plaintiff identified as Correction Officers who worked in the housing unit where he resided at Ulster.  (Compl., Third Cause of Action, Dkt. No. 1 at 8).  On July 8, 2010, the Clerk's Office notified plaintiff (at his address of record at Groveland Correctional Facility) that DOCS advised that it had no record of employees with those names.  The Clerk directed plaintiff to submit a USM-285 form with additional information about "Scotty Rock" and "Ms. Sarkowski" that would enable the U.S. Marshal to effect service on those defendants.  (Dkt. No. 28; see also Dkt. Nos. 14, 20).  To date, the plaintiff has not provided the necessary information to the U.S.

York State Department of Correctional Services ("DOCS")[2] violated his constitutional rights during the three-week period in December 2007 when he was confined at the Ulster Correctional Facility ("Ulster").  Plaintiff claims that the conditions of confinement at Ulster–"rusty" water in the showers; the failure of DOCS to provide shower shoes, body lotion, or better soap; and the lack of heat in his dormitory and the mess hall–subjected him to cruel and unusual punishment and violated his due process and equal protection rights.  He also alleges that defendant Taylor ignored the "grievances" submitted by plaintiff and other inmates about the living conditions at Ulster.  Plaintiff, now confined in a different DOCS facility, seeks injunctive relief

---

Marshal.  The DOCS Inmate Information web site indicates that plaintiff is currently incarcerated, not at Groveland, but at Attica Correctional Facility.  However, plaintiff has not advised the Clerk of new contact information, as he is required to do.  Thus, his failure to respond to the Clerk's directions to submit a USM-285 is not excused by the fact that the notice may have been sent to him after he was transferred out of Groveland.  *Dumpson v. Goord*, 00-CV-6039, 2004 WL 1638183, at *3 (W.D.N.Y. July 22, 2004) ("The demand that plaintiffs provide contact information is . . . the obvious minimal requirement for pursuing a lawsuit.").  While this court concludes that plaintiff has not stated viable claims against defendants "Rock" and "Sarkowski," the complaint could be dismissed as against them based on plaintiff's lack of diligence in facilitating proper service.  See, e.g., *White v. Murphy*, 9:07-CV-1147 (FJS/DEP), 2008 WL 4757357, at *3 (N.D.N.Y. Oct. 29, 2008); *Littman v. Senkowski*, 9:05-CV-1104 (LEK/GHL), 2008 WL 420011, at *1, 7-8 (N.D.N.Y. Feb. 11, 2008 ).

   [2] The 9/18/08 filing order in this case directed plaintiff to take reasonable steps to determine the identity of the "Jane/John Doe" defendants through discovery.  Plaintiff  was warned that "if these unnamed individuals are not timely served, the action may be dismissed against them."  (Dkt. No. 4 at 2).  Plaintiff has taken no apparent action, for almost two years, to identify these other defendants.  Because he failed to timely identify and serve the John Doe defendants, and because as outlined below, no cognizable cause of action is asserted herein, we recommend dismissal of all claims asserted against them. *See, e.g., Smith v. Graziano*, 9:08-CV-469 (GLS/RFT), 2010 WL 1330019, at *6 (N.D.N.Y. Mar. 16, 2010); *Gillard v. Burge*, 9:03-CV-1537 (TJM/RFT), 2007 WL 1074789, at *1, 10 (N.D.N.Y. Apr. 5, 2007) (citing FED. R. CIV. P. 4(m) & Local Rules N.D.N.Y. 4.1(b)); *Pravda v. City of Albany*, 178 F.R.D. 25, 26 (N.D.N.Y.1998).

and substantial compensatory and punitive damages.  (Compl.)[3]

Presently before this court is a motion for summary judgment, pursuant to FED. R. CIV. P. 56, filed on behalf of defendants Carlsen and Taylor.  (Dkt. No. 24). Defense counsel argues that plaintiff's constitutional rights were not violated, and that neither of the named and served defendants was personally involved in the conduct about which plaintiff complains.  After seeking and receiving two extensions of time, plaintiff has failed to respond to the summary judgment motion.  (See Text Orders of 2/2/2010 and 3/29/2010).  For the following reasons, this court recommends that the defendants' motion for summary judgment be granted, and that the complaint be dismissed in its entirety as to all defendants, including those who have not been named and/or served.

## DISCUSSION

## I.   Facts

Plaintiff arrived at Ulster Correctional Facility on or about December 7, 2007 and was transferred out on approximately December 27th.  (Compl. ¶ 6; Pl.'s 11/13/09 Deposition at 10-11 ("11/09 Dep."), Ex. B to Levin Decl., Dkt. No. 24-4 at 67-68).[4] Upon his arrival, plaintiff was issued a bag containing clothing and basic toiletries, including soap, a tooth brush, and toothpaste.  (Carlsen Decl. ¶¶ 26-28, Dkt. No. 24-5;

---

[3] Because plaintiff was transferred out of Ulster in December 2007, his request for injunctive relief with respect to that facility is moot.  *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility).

[4] Ulster is a reception center for new DOCS inmates.  After about three weeks at Ulster, plaintiff was was transferred to Groveland Correctional Facility.  (*Id.*).

11/09 Dep. at 41).  Ulster did not issue skin lotion or shower shoes to inmates, and plaintiff could not purchase those items in the Ulster commissary because his personal funds had not been transferred from the Rikers Island facility, where he had previously been confined.  (Compl. ¶ 6; 11/09 Dep. at 26, 33).

Plaintiff alleges that he was compelled to bathe and wash in "rusty water," using communal showers and sinks, with the "Corcraft" bar soap provided by DOCS.   The "harsh" combination of the rusty water and DOCS-issued soap caused plaintiff's skin to crack and itch.  (Compl. ¶ 6; 11/09 Dep. at 27-31).  When plaintiff went to Nurse "Jane Doe," she gave him small packets of ointment for his dry skin on several occasions, but did not provide him with adequate amounts of ointment or lotion to alleviate his discomfort.  (Compl. ¶ 6, Second Cause of Action; 11/09 Dep. at 31-35).

The complaint alleges that plaintiff was forced to sleep in cold conditions because defendants "Ms. Sarkowski," "Scotty Rock," and several John Doe defendants refused to turn off the vents in the housing unit that were drawing cold air from outside.  (Compl., Third Cause of Action).  Plaintiff also claims that several "John Doe" defendants intentionally subjected inmates at Ulster to cold temperatures in the mess hall by propping open two outside doors.  (Compl., Fourth Cause of Action). Plaintiff was permitted to wear all of his winter clothes, including a sweatshirt, winter coat, and hat, while he took his meals and while he slept.  (11/09 Dep. at 46, 50, 57-59).

Plaintiff alleges that he signed on to several "grievances" prepared by another

inmate,[5] complaining about the various deprivations they suffered.  He claims that

defendant Taylor, Ulster's Grievance Program Supervisor, violated his constitutional

rights by ignoring those grievances.  (Compl., Fifth Cause of Action; 11/09 Dep. at

68-70).  Defendant Taylor stated that plaintiff never filed what would be classified as

a proper "grievance" at Ulster.  Rather, plaintiff and several other inmates signed five

petitions, complaining about various conditions at Ulster.  (Taylor Decl. ¶¶ 8-12 & Ex.

A, Dkt. No. 24-6).  Because such joint petitions are considered "an act of organization,

which can threaten facility safety and security," DOCS procedures requires that such

petitions to be referred to the "Executive Team" at the facility.  Defendant Taylor

referred the petitions signed by plaintiff to the Ulster Executive Team, as required by

DOCS procedures, and thereafter had no role in how they were addressed.  (Taylor

Decl. ¶¶ 12-17).

In addition to the above-described claims against defendants Taylor, Ms.

Sarkowski, Scotty Rock, and the other unnamed defendants, plaintiff claims that

Ulster Superintendent Carlsen and others violated his constitutional rights in various

ways.  Plaintiff claims that defendant Carlsen subjected plaintiff to cruel and unusual

punishment and violated other constitutional rights by implementing policies that

resulted in inmates being exposed to "rusty" water; being deprived of shower shoes,

---

[5] Inmate Anthony Cusamano authored the various petitions that plaintiff signed.  During his deposition, plaintiff admitted he did not file any individual grievances himself, as he alleged in his complaint.  (11/09 Dep. at 56, 70; Compl., Fifth Cause of Action).  Mr. Cusamano also filed a civil rights complaint making allegations about essentially the same conditions of confinement at Ulster during the same time period.  See 9/5/09 Memorandum-Decision and Order at 4-7, Civil Action No. 9:08CV-755 (FJS/GHL), Dkt. No. 20.

body lotion, and better soap; and being subjected to cold conditions in the facility. (Compl., First and Sixth Causes of Action). Supt. Carlsen noted that, while he had overall responsibility for the Ulster facility, he delegated day-to-day management responsibility with respect to the physical plant to subordinates. (Carlsen Decl. ¶¶ 4-5). He provided information about the water supply at Ulster and documented that it was frequently tested and determined to be in compliance with New York State water quality guidelines during the period that plaintiff was confined at Ulster. (Carlsen Decl. ¶¶ 4-16). Supt. Carlsen stated that he was not made aware (and he did not believe) that inmates were subjected to unsafe or unhealthy water, deprived of adequate heat, or denied necessary basic amenities during the applicable time period. (Carlsen Decl. ¶¶ 17-19, 22-24, 29-31).

Plaintiff further alleges that all of the defendants violated his due process and equal protection rights by subjecting him to, or not protecting him from, harsh conditions of confinement based on his status as a convicted felon, a Hispanic and minority person, and a low-income adult. (Compl. Seventh, Eighth, and Ninth Causes of Action). During his deposition, however, plaintiff acknowledged that the conditions of confinement about which he complained generally effected all the reception inmates at Ulster equally. (Pl.'s 3/20/2009 Deposition at 17, ("3/09 Dep."), Ex. A to Levin Decl., Dkt. No. 24-4 at 20; 11/09 Dep. at 40, 61, 68, 76-77).[6] Finally,

---

[6] Plaintiff was deposed twice because he refused to complete his first deposition in March 2009, and was ordered to submit to a second deposition in November 2009. (3/09 Dep. at 38-39; 11/09 Dep. at 7-8; 10/6/09 Order, Dkt. No. 23). Defense counsel covered some of the same issues in both depositions.

plaintiff claims that all defendants subjected him to mental duress and emotional suffering, through the various violations of his constitutional rights.  (Compl., Tenth Cause of Action).

## II.   Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must

resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers."  *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).  While a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).[7]

---

[7] The liberal pleading standards for *pro se* litigants do not excuse them from following the procedural formalities of summary judgment.  *Govan v. Campbell*, 289 F. Supp. 2d at 295.  Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  This rule may be applied against *pro se* litigants; and a court is not obliged to conduct an independent review of the record to find proof of a factual dispute where, as here, a *pro se* plaintiff has failed to respond to the summary judgment motion in accordance with the applicable rules.  *Id.*  In this case, plaintiff has not responded to the defendants' summary judgment motion, with no apparent excuse.  Nonetheless, in determining whether there are material issues of fact in dispute, this court has considered plaintiff's complaint and his deposition testimony, to the extent it documents or clarifies the allegations in his complaint.  As noted below, this court will not consider entirely new allegations that were made during plaintiff's deposition, but were not reflected in his complaint.

### III.   Eighth Amendment Medical Care Claim

####    A.    Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184.

####    1.    Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the

9

plaintiff.  *Id.*  If the "unreasonable care" consists of a failure to provide **any** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.*  (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone.  *Id.*  (citing *Smith v. Carpenter*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability.  *Id.* at 280.

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind."  *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id*.  Deliberate indifference is equivalent to subjective recklessness.  *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety.  *Id.* at

280-81.  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference.  *Id.; Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id.*  An inmate does not have the right to treatment of his choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  The fact that plaintiff might have preferred an alternative treatment, or believes that he did not get the medical attention he desired, does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments, and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice,

11

malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment, are not actionable under Section 1983.

### B.    Application

The complaint alleges that Nurse "Jane Doe," following policies implemented by Supt. Carlsen, denied plaintiff ointment and lotion needed to remedy his dry and itchy skin. He claims that the nurse told him that he could purchase body lotion at the commissary, but the commissary was not available to him. (Compl. ¶ 6). Because plaintiff's medical condition was not sufficiently "serious," he can not satisfy the objective element of a claim for constitutionally inadequate medical care. Moreover, plaintiff's unsupported claim that the defendant nurse and Supt. Carlsen were deliberately indifferent to his medical needs should not survive summary judgment.

### 1.    Serious Medical Condition

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong*, 143 F.3d at 702. Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

12

In his deposition, plaintiff said the cracks in his skin, mostly on his back, were "very small" and did not bleed.  His dry, cracking skin was "painful," but plaintiff described the "pain" as "just discomfort."  (11/09 Dep. at 29-30).  Plaintiff's medical issues in December 2007–dry, cracked, and itchy skin[8]–do not meet the objective standards of a "serious" medical condition.  *See, e.g., Cusamano v. Carlsen*, Civil Action No. 9:08CV-755 (FJS/GHL), 9/5/09 Memorandum-Decision and Order at 13, Dkt. No. 20 (foot fungus, dry skin, and flaky scalp do not amount to "serious" medical conditions, and do not endanger plaintiff's health or safety); *Troy v. Kuhlmann*, No. 96 Civ. 7190, 1999 WL 825622, at *13 (S.D.N.Y. Oct. 15, 1999) (granting summary judgment as to plaintiff's Eighth Amendment medical claims relating to two rashes caused by washing pots without rubber gloves, because that condition did not create an objectively serious medical need); *Scott v. Laux*, 9:07-CV-936 (GLS/DRH), 2008 WL 4371778, at *5 (N.D.N.Y. Sept. 18, 2008) (a fungal infection on one's body would not suffice to warrant Eighth Amendment protection).  *Cf. Fox v. Brown*, No. 05-CV-1292 (LEK/GJD), 2007 WL 586724, at *8 (N.D.N.Y. Feb. 21, 2007) (this court is not prepared to find, in the context of a motion to dismiss, that a skin rash causing open sores, could not be a "serious" medical need under any circumstances).

---

[8] During his deposition, plaintiff testified that he also developed athlete's foot fungus as a result of showering without shower shoes, but the nurse provided him with adequate medication to address that condition.  (11/09 Dep. at 42-43).  Plaintiff also claimed, for the first time in November 2009, that his exposure to the rusty water and harsh soap at Ulster for three weeks in December 2007, caused him to develop "prostate cancer, which also has also spread to my lower back."  He denied having "skin cancer."  (11/09 Dep. at 28-29).  There is no indication, in the complaint or elsewhere, that plaintiff was suffering from cancer while at Ulster.  Even if plaintiff subsequently developed prostate cancer, as he claimed in November 2009, that is not relevant to his claim of constitutionally inadequate medical care in December 2007.

## 2.      Deliberate Indifference

Based on the above analysis of plaintiff's medical condition in December 2007, plaintiff can not establish that any of the defendants recognized a serious risk to his health and deliberately ignored it.  Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary.  However, one observation about the defendant nurse is appropriate.

First, plaintiff admits that Nurse "Jane Doe" provided him with small packets of ointment for his dry skin on several occasions, as well as sufficient medication for his occasional athlete's foot.  (11/09 Dep. at 31-33, 42-43).  The fact that she did not also provide plaintiff with body lotion, which was a commissary item at Ulster, would not support a claim that she was deliberately indifferent to a serious medical issue.  *See, e.g., Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *11 (N.D.N.Y. Mar. 15, 2010) (even if nurse had been completely dismissive of plaintiff, who sought emergency medical treatment based on complaints of back pain that the nurse did not view as an emergency, it would not constitute deliberate indifference); *Savage v. Brue*, 9:05-CV-857, 2007 WL 3047110  at *9 (N.D.N.Y. Oct. 18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent).

IV.    **Eighth Amendment Conditions-of-Confinement Claims**

A.    **Legal Standards**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994).  To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994).  Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation.  *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298).  "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim."  *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 199) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the

15

basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835.  In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*.

### B.    Application

#### 1.    Water Quality

The complaint alleges that the plaintiff was required to bathe and wash up in "rusty" water.  During his deposition, plaintiff elaborated that the water was brown and would, during the course of a shower, discolor white boxer shorts to the shade of a manilla folder.  He stated that the water was "irritating" and "itchy" on his skin, in that it made it feel like "it was drying your skin out."  (11/09 Dep. at 19-20; 3/09 Dep. at 25-26).  Plaintiff claimed, when he brushed his teeth using water from the sink, "your teeth were turning brown."  (3/09 Dep. at 25; 11/09 Dep. at 36).  During his first deposition, plaintiff acknowledged what was apparent from his complaint–that he was not complaining about the drinking water at Ulster, only the water with which he showered and brushed his teeth.  (3/09 Dep. at 27).

16

Seven months later, plaintiff claimed that he had contracted cancer because some of the water "probably got down my throat" "when I brushed my teeth[.]" (11/09 Dep. at 36).  Plaintiff's belated claims that his exposure to the rusty water and Corcraft soap in the Ulster bathroom caused him to develop prostate cancer (11/09 Dep. at 28-29) are not mentioned in the complaint, and are speculative, unsupported, and highly implausible.  Given that plaintiff has not sought to amend his complaint, and that he has provided no factual or expert support for the claim that conditions at Ulster caused him to later develop cancer, his November 2009 deposition testimony does not create any issue of fact that would preclude summary judgment.  *See, e.g., Perez v. Hawk*, 302 F. Supp. 2d 9, 22 (E.D.N.Y. 2004) (dismissing inmate's Eighth Amendment claims, in part because he failed clearly to allege a causal link between alleged chemicals in the water supply and his symptoms); *Bellezza v. Fischer*, 05 Civ. 98, 2006 WL 3019760, at *4, n.2 (S.D.N.Y. Oct. 24, 2006) (inmate plaintiff can not rely on his speculative and unsupported allegations that "extremely dark and cloudy" water caused him to suffer headaches, loose bowel movements, stained teeth, and liver or kidney damage  to defeat summary judgment).

Supt. Carlsen documented the efforts to ensure that the water supply at Ulster was safe and healthy.  Ulster and Eastern Correctional Facilities share a common water supply, which only serves approximately 1,600 individuals.  (Carlsen Decl. ¶¶ 6-7).  Water is pumped from two drilled wells, to a water treatment plant where it is softened and disinfected, and then transported to a 1.5 million gallon storage tank for distribution to both facilities through several miles of ductile iron.  (*Id.* ¶¶ 8-10).

17

To ensure that Ulster's water supply is safe, DOCS officials test the facility's water on a daily basis. Additionally, since before plaintiff filed his complaint, an independent laboratory has tested the water supply on a monthly basis. (*Id.* ¶¶ 12-13). The water is tested for turbidity and various organic and inorganic contaminants, but not iron specifically. (Carlsen Decl., Exs. A & B, Dkt. No. 24-5 at 7-8, 12-13).[9] In 2007, when plaintiff was housed at Ulster, the water supply there was compliant with applicable state drinking water operating, monitoring, and reporting requirements. Further, in 2007, Ulster's water system had no violations of state regulatory limits for contaminants. (*Id.* ¶¶ 14-6, Exs. A & B).

There is no question that subjecting inmates to unsafe or unhealthy drinking water would be a sufficiently "serious" risk that would satisfy the objective element of an Eighth Amendment cause of action. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery.") (dicta); *LaBounty v. Coughlin*, 137 F.3d 68, 70-71 (2d Cir. 1998) (declining to grant summary judgment on a claim that chemicals in the drinking water caused him to suffer myriad illnesses because the defendants failed to produce

---

[9] Turbidity or cloudiness in water can be caused by a number of sources, including "high iron concentrations which give water a rust-red coloration. . . ." EPA Guidance Manual, Turbidity Provisions, § 7.2 at p. 7-1, www.epa.gov/ogwdw000/mdbp/pdf/turbidity/chap_07.pdf , attached hereto as Exhibit A. Hence, the tests of the water at Ulster for turbidity would have provided some indication of visible iron/rust particles in the water. "Unlike lead and copper, the ingestion of iron in drinking water is not directly associated with adverse health effects, so mandatory [EPA] iron regulations are not in place." EPA *Corrosion, Scaling, and Metal Mobility Research, Iron*, at p. 2, www.epa.gov/nrmrl/wswrd/cr/corr_res_iron.html, attached hereto as Exhibit B.

documents identifying the chemicals placed in the water).  There is some lower court authority in this circuit to suggest that "unsuitable" water for drinking **and bathing** can support an Eighth Amendment cause of action.  *See, e.g., Bellezza v. Fischer*, 2006 WL 3019760, at *4 (denying summary judgment where plaintiff alleged that the water coming out of the faucet in his cell burned his throat and, at least some of the time, was extremely dark and cloudy; he was also unable to take a shower without his skin itching).

The complaint alleges that rusty water at Ulster caused plaintiff discomfort by drying out his skin and causing discoloration of his boxer shorts, and, perhaps, his teeth.  Given the lack of corroboration that iron, even in drinking water, poses a threat to health or safety, these allegations do not establish a sufficiently serious risk to plaintiff's well-being to satisfy the objective element of his Eighth Amendment claim. *See, e.g., Cruz v. Jackson*, 94 Civ. 2600, 1997 WL 45348, at *6-7 (S.D.N.Y. Feb. 5, 1997) (an isolated serving of rusty drinking water would not give rise to an Eighth Amendment claim); *Cherry v. Edwards*, 01 Civ. 7886, 2005 WL 107095, at *1, 3, 8-9 (S.D.N.Y. Jan. 18, 2005) (granting summary judgment to defendants on a contaminated water exposure claim, despite complaints about a "smelly odor" and discoloration during the time period in question); *Mele v. Connecticut*, 3:06CV1741, 2007 WL 445488, at *2 (D. Conn. Feb. 9, 2007) (allegation that the water at the prison appeared to discolor his shirt after washing does not state a claim for deprivation of inmate's Eighth Amendment rights).

In any event, given the testing results on the water at Ulster, Supt. Carlsen and

the employees to whom he delegated responsibility for ensuring the safety of the water supply, would not have perceived a substantial risk to the health and safety of the inmates from the water. *See, e.g.*, *Wright v. New York State Dept. of Correctional Services*, 06 Civ. 03400, 2008 WL 5055660, at *10-11 (S.D.N.Y. Oct. 10, 2008) (water-testing and other records show that prison officials took reasonable measures to keep the drinking water safe; plaintiff has provided no evidence that anyone at the prison "knew of . . . yet refused to remedy" the risk of H. pylori or Giardia in drinking water). Even if Ulster officials were made aware of, and ignored, complaints that "rusty" water was causing dry and itchy skin, or other such discomfort, this would not constitute "deliberately indifference" to "serious" health concerns of the inmates at that facility.

### 2.    Allegations of Cold Living Conditions

Plaintiff alleges that, during the three weeks he was confined in Ulster in December 2007, he was subjected to cold temperatures, both in his dormitory and in the mess hall. In his complaint, plaintiff alleges that the various defendants, who failed to remedy an open air vent in his housing unit and who propped open the outside doors in the mess hall, were malicious and deliberately indifferent to the inmates' need for warmth. (Compl., Third and Fourth Causes of Action).

It is clear that exposing inmates to severe cold for a prolonged period of time is a serious deprivation within the ambit of the Eighth Amendment. *See, e.g., Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir.1988) (reversing grant of summary judgment dismissing Eighth Amendment claim where inmate established that he had been

exposed to sub-freezing temperatures for most of a three-month period in fall and winter); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir.2001) (summary judgment on Eighth Amendment claim not appropriate where inmate established that he had been subjected to, *inter alia*, temperatures near or well below freezing for a five-month period during the winter). *See also Wright v. McMann*, 387 F.2d 519, 521-522, 526 (2d Cir.1967) (reversing Rule 12(b)(6) dismissal of Eighth Amendment claim alleging that inmate was, *inter alia*, stripped completely naked and exposed to sub-freezing temperatures for 11 days during winter in Upstate New York, then was provided a "thin pair of underwear" for another 22 days under similar conditions, and then, a year later, was confined for 21 days under similar conditions). The conditions described by plaintiff, however, were clearly not so prolonged or severe.

During his deposition, plaintiff estimated that the temperature in his dormitory got as cold as 50 to 55 degrees, except when the sun or the heating system periodically brought up the temperature. He claimed that sometimes it was cold enough that "you could see your breath."[10]  (11/09 Dep. at 47-48, 50).  When he slept, plaintiff was permitted to wear all of his clothes, including a sweatshirt, winter coat, and hat, because inmates were provided only one summer blanket.  (11/09 Dep. at 46, 48-50).

---

[10] Although this court's decision does not rely on any factual finding with respect to plaintiff's comment about being able to see his breath, I offer the following contextual information. Your breath can mix with the outside air to form the visible mist that meteorologists call a mixing cloud at a fairly broad range of temperatures and humidities, according to Jeff Warner, a meteorologist at Pennsylvania State University. Your breath can be visible if the air cools to 50 degrees after a shower and the relative humidity is high. In outside air at 45 degrees and 85 percent relative humidity, your breath will yield a cloud. *See* "Q&A," by C. Clairborne Ray, *New York Times*, April 27, 2004, www.nytimes.com/2004/04/27/science/q-a-368377.html , attached hereto as Exhibit C.

Plaintiff estimated that the temperature in the mess hall was the same as it was outside ("probably 30, 35 [degrees]") because the correction officers propped open two outside doors.  (11/09 Dep. at 57-58).  The inmates spent approximately 15 minutes per day in the mess halls eating their meals.  Plaintiff wore his winter coat and hat while eating his meals.  (11/09 Dep. at 57-59).

Even assuming plaintiff's allegations are not exaggerated, he was not subjected to freezing temperatures for prolonged periods, and he was permitted to wear heavy winter clothes to maintain warmth.  While the described conditions in the mess hall would certainly have been unpleasant, exposure, even to freezing temperature, for 15 minutes per day, when you have the opportunity to wear heavy winter clothes, did not deprive him of "the minimal civilized measures of life's necessities."  *See, e.g.*, *Smith v. Burge*, No. 9:03-CV-0955 (LEK/GHL), 2006 WL 2805242 at *7 (N.D.N.Y. Sept. 28, 2006) (confinement of inmate, for less than one day, in a T-shirt and underwear, in a cell with an open window, exposing him to "cold" or "very cold" temperatures, was not sufficiently prolonged or severe to rise to the level of an Eighth Amendment violation); *Borges v. McGinnis*, 03-CV-6375 , 2007 WL 1232227, at *4-6 (W.D.N.Y. Apr. 26, 2007 ) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation); *Grant v. Riley*, 89 Civ. 0359, 1993 WL 485600 at *4 (S.D.N.Y.  Nov. 24, 1993) (confining inmate for three days, in an unheated room with a cold wind blowing through a broken window, and denying him a coat, bedding or

22

blankets for over nine hours, failed to allege treatment that offends concepts of dignity, civilized standards, humanity, and decency, as required to state an Eighth Amendment cause of action).

The conditions in plaintiffs dormitory, to which he was subjected for longer periods of the day and night for three weeks, did not involve freezing temperatures, and, again, the plaintiff was able to maintain his warmth with a blanket and heavy winter clothing. *See, e.g., Brown v. McElroy*, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (confining INS detainee in a cold room for a prolonged time period did not meet the objective criteria for an Eighth Amendment violation because he was able to get some warmth with blankets, and provide himself with livable conditions).  The alleged conditions in plaintiff's dormitory are clearly not as severe as those described in the Second Circuit cases which found that inmates were subjected to cruel and unusual punishment by prolonged exposure to freezing temperatures.  *See, e.g., Trammel v. Keane*, 338 F.3d 155, 158-159, 164-65 (2d Cir.2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on (1) deprivation of all property except one pair of undershorts and (2) exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing–17 days–was not long enough); *Scot v. Merola*, 555 F. Supp. 230, 233-234 (S.D.N.Y. 1983) (granting Rule 12(b)(6) motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area with broken windows and without heat, where the temperature dropped below fifty

degrees); *Davis v. Buffardi*, 01-CV-285, 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (granting defendants' motion for summary judgment dismissing claim of inadequate prison conditions based on denial of extra blankets and clothing for ten days in February, when the prison's boiler was not working, because pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm").

Moreover, the conclusory allegations in the complaint that the various defendants were acting with deliberate indifference to the inmates' need for warmth is not supported by the record, including his own deposition testimony.  Plaintiff testified that he did not know if anyone deliberately turned off the heat in his housing unit.  He acknowledges that Ms. Sarkowski, the regular officer in his dormitory, also complained about the cold, and made efforts to get the heat "fixed."  (11/09 Dep. at 54-55).  If the correction officers worked in the same conditions as the inmates and attempted to fix the alleged problem with the heat, they were clearly not acting with the intention of making the plaintiff and others suffer.[11]

### 3.    Deprivation of Certain Hygiene Supplies

Plaintiff acknowledges that inmates at Ulster were provided clothing and various bathroom supplies, including soap,  a towel, a wash cloth, a toothbrush,

---

[11] To the extent Ms. Sarkowski and/or the other, unnamed correction officers in plaintiff's housing unit reported the malfunction of the heating system to the appropriate maintenance staff, they would not be responsible or liable if the necessary repairs were not made. *See, e.g., Green v. Bauvi*, 792 F. Supp. 928, 941-942 (S.D.N.Y. 1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

toothpaste, and toilet paper.  (11/09 Dep. at 41-42).  He claims, however, that his

Eighth Amendment rights were violated because he was not provided "basic

amenities" such as shower slippers, skin lotion, and "acceptable" soap.  (Compl. First

and Sixth Causes of Action).  This alleged deprivation caused him to suffer from dry

and cracked skin, and athlete's foot, which as noted above, are not "serious" medical

problems under Eighth Amendment standards.  (11/09 Dep. at 27-27, 42-43).

    As Judge Scullin found, in addressing a lawsuit by an inmate challenging

essentially the same conditions of confinement at Ulster, "being deprived of shower

slippers, shampoo, lotion, and acceptable soap for a period of approximately

twenty-six days is not 'objectively sufficiently serious' and does not amount to the

denial of "the minimal civilized measure of life's necessities." *Cusamano v. Carlsen*,

9/5/09 Memorandum-Decision and Order at 12 (citing, *inter alia*, *Fernandez v.

Armstrong*, No. 3:02CV2252, 2005 WL 733664, at *5 (D. Conn. Mar. 30, 2005)

(denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a

period of sixteen days does not allege a violation of Eighth Amendment rights

(citations omitted)); *Trammell v. Keane*, 338 F.3d at 165 (holding that "[d]eprivation

of . . . toiletries [other than toilet paper] for approximately two weeks–while perhaps

uncomfortable–does not pose such an obvious risk to an inmate's health or safety to

suggest that the defendants were 'aware of facts from which the inference could be

drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the

inference.'" (quoting *Farmer*, 511 U.S. at 837); *Chavis v. Kienert*, No. 9:03-CV-0039

(FJS/RFT), 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries

for a two month period did not rise to the level of deliberate indifference to the prisoner's health or safety)).  The deprivation of "amenities" alleged by plaintiff does not satisfy the objective or subjective elements of an Eighth Amendment violation.

## V.    Due Process and Equal Protection Claims

Plaintiff alleges that all of the defendants violated his due process and equal protection rights by subjecting him to or not protecting him from harsh conditions of confinement based on his status as a convicted felon, a Hispanic and minority person, and a low-income adult.  (Compl. Seventh, Eighth, and Ninth Causes of Action). Plaintiff's conclusory due process allegations essentially duplicate the Eighth Amendment claims that this court has already considered, and need not be addressed separately.[12]  His Equal Protection claims are also conclusory and can not withstand defendants' summary judgment motion.

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike.  *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  A plaintiff alleging a violation of his equal protection rights must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination, typically against an identifiable or suspect class, such as

---

[12] *See Cusamano v. Carlsen*, 9/5/09 Memorandum-Decision and Order at 17-18 & n.10 (the gist of plaintiff's due process allegation is the inadequacy of conditions of confinement at Ulster, which the court has already addressed under Eighth Amendment standards).  *See also Lighthall v. Vadlamudi*, 9:04-CV-721, 2006 WL 721568, at *15-16 (N.D.N.Y. Mar. 17, 2006) (Fourteenth Amendment due process and equal protection claims based on alleged indifference to plaintiff's medical needs were "disguised" Eighth Amendment claims and would be treated as such).

race or religion.  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *Giano v. Senkowski*, 54 F.3d at 1057.  Then, plaintiff must establish that the difference in treatment can not survive the appropriate level of scrutiny.  *Id*.

Plaintiff's equal protection claims lack merit because he acknowledges that similarly-situated individuals at Ulster were not treated differently.  Plaintiff concedes that other newly-admitted inmates, regardless of race or ethnicity, experienced the same alleged deprivations that he claimed to have suffered.  (3/09 Dep. at 17; 11/09 Dep. at 40, 61, 68, 76-77).[13]

To the extent plaintiff is claiming that he was treated differently than others because he was a convicted felon, "felons do not constitute a suspect class" for the purposes of the Equal Protection Clause.  *Dallara v. Sinnott*, No. 1:98-CV-3472, 2006 WL 1582159, at *2 (E.D.N.Y. June 5, 2006) (citing *Furst v. New York City Transit Auth*., 631 F. Supp. 1331, 1336 (E.D.N.Y. 1986)).  Similarly, economic status is not a suspect class for purposes of equal protection.  *Caraballea v. Pataki*, No. 05-CV-0326, 2009 WL 1812824, at *5 (W.D.N.Y. June 25, 2009).  As Judge Scullin found, with respect to virtually identical claims by another Ulster inmate challenging the conditions of confinement, plaintiff's  equal protection claims fail as a matter of law and should be dismissed against all defendants.  *Cusamano v. Carlsen*, 9/5/09

---

[13] Plaintiff claims that some "reception inmates" at Ulster were allowed to purchase items like lotion or shower shoes from the commissary, which he could not do.  However, he acknowledges that he would have been allowed to do the same if his commissary money had cleared from Rikers Island.  (3/09 Dep. at 17-18; 11/09 Dep. at 13, 26, 33, 38).  To the extent plaintiff was treated differently from other inmates, it was not because of relative socioeconomic status, but because some other inmates had their commissary money transferred from other facilities more quickly.

Memorandum-Decision and Order at 18.[14]

## VI.   Claims Related to "Grievances"

Plaintiff alleges that defendant Taylor, Ulster's Grievance Program Supervisor, violated his constitutional rights by ignoring several petitions signed by plaintiff and other inmates complaining about various conditions at Ulster.  (Compl., Fifth Cause of Action; 11/09 Dep. at 68-70).  As noted above, defendant Taylor states that, because of the security concerns surrounding collective inmate petitions, the responsibility and authority to address these complaints belonged, not to him, but to the Ulster Executive Team.[15]

---

[14] The instant complaint suggests that all defendants conspired to violate plaintiff's constitutional rights under, *inter alia*, 42 U.S.C. §§ 1983, 1985, and 1986.  A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by allegations of conduct easily explained as individual action, is insufficient.  *See Iqbal v. Hasty*, 490 F.3d 143, 177 (2d Cir. 2007), *rev'd on other grounds sub nom*. *Ashcroft v. Iqbal*, _ U.S. _, 129 S. Ct. 1937 (2009)  *See also Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999).  Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).  Conclusory, vague, and general allegations, such as those in plaintiff's complaint in this case, are insufficient to support a civil rights conspiracy claim.  *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999).  In any event, as discussed herein, plaintiff has not asserted any viable substantive constitutional claims that would support a conspiracy claim.

[15] Because he referred these complaint letters to the Executive Committee pursuant to DOCS policy, defendant Taylor would not have been "personally involved" with the alleged failure to respond to them, and thus could not be liable under section 1983, even if there was a resulting constitutional violation.  "[i]t is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.  *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation.  *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.*, 491 F. Supp. 2d 342, 347 (W.D.N.Y.2007)." *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008).  Furthermore, defendant Taylor, in his capacity as the Inmate Grievance Supervisor, had

In any event, the law is well-settled that inmates do not have a constitutional right to grievance procedures.  *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003); *Davis v. Buffardi*, 2005 WL 1174088, at *3 ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted).  A violation of the inmate grievance procedures does not give rise to claim under section 1983.  *Cancel v. Goord*, No. 00. CIV. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001).  The refusal to process an inmate's grievance, or the failure to ensure that grievances are properly processed similarly, does not create a cognizable due process claim.  *Id.; Avent v. Doe*, No. 9:05-CV-1311 (FJS/GJD), 2008 WL 877176, at *8 (N.D.N.Y. Mar. 31, 2008).

## VI.   Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated

---

no responsibility or control over conditions such as the water quality at Ulster or the temperature maintained in the mess hall or dormitories.  (Taylor Decl. ¶¶ 18, 24).  Thus, he could not be liable under Section 1983 for the failure to remedy those alleged conditions.  *See, e.g., Green v. Bauvi*, 792 F. Supp. at 941-942.

in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d at 152–53 (stating that defendant could be liable under section 1983 if he failed to remedy a constitutional violation after learning of it, or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In addressing a motion to dismiss the very similar claims of another inmate at Ulster, Judge Scullin concluded that Supt. Carlsen was not "personally involved" in implementing or maintaining policies which allegedly resulted in poor water quality and inadequate heat at his facility.  *Cusamano v. Carlsen*, 9/5/09 Memorandum-Decision and Order at 15-16.[16]  On a motion for reconsideration, Judge Scullin decided not to dismiss plaintiff Cusamano's Eighth Amendment claims against Supt. Carlsen alleging unconstitutional conditions of confinement (relating to the water quality and heating issues) until plaintiff had an opportunity to conduct further discovery to determine whether Supt. Carlsen or other, unnamed defendants might, indeed, be personally responsible for those conditions.  *Cusamano v. Carlsen*, 5/21/10

---

[16] In his declaration in this case, Supt. Carlsen swore that he was not informed by his staff about any of the alleged conditions about which plaintiff and other inmates at Ulster wrote letters of Complaint.  (Carlsen Decl. at 17-18, 22-24, 29-30).

Memorandum- Decision and Order at 4-5, Civil Action No. 9:08CV-755, Dkt. No. 26 (citing *Davis v. Kelly*, 160 F.3d 917, 920-21 (2d Cir. 1998)).  The Second Circuit in *Davis* held:

> . . . [W]hen a *pro se* plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur without an opportunity for additional discovery.

*Davis v. Kelly,* 160 F.3d at 922.

In this case, the dismissal of plaintiff's claim should not be delayed, based on *Davis*, to provide him an opportunity to conduct further discovery to identify those who were personally involved in the alleged unconstitutional conditions of confinement.  *Cusamano* involved a motion to dismiss under FED. R. CIV. P. 12(b)(6), filed before the plaintiff had a meaningful opportunity for discovery.  In this case, plaintiff Thompson has had a full opportunity for discovery and failed to reply to a motion for summary judgment, amply supported by sworn declarations and documentary evidence.  As discussed above, this court has concluded that none of plaintiff's constitutional claims should survive summary judgment motion, irrespective of whether the named and served plaintiffs are personally involved with the alleged violations.  Because plaintiff has no "colorable" claims remaining, it would be futile to hold in Supt. Carlsen as a defendant to allow plaintiff more time to try to develop evidence establishing the personal involvement of defendant Carlsen or

the other, unnamed and/or unserved defendants.[17]

## VII.   Alleged Mental and Emotional Injuries

In his Tenth Cause of Action, plaintiff seeks damages for the mental duress and emotional suffering allegedly caused by the claimed violations of his constitutional rights.  The Second Circuit has held that 42 U.S.C. § 1997e(e)[18] functions as a limitation on recovery of damages for mental and emotional injury, in the absence of a showing of physical injury, in all federal civil actions, including actions alleging constitutional violations.  *Thompson v Carter*, 284 F.3d 411, 417 (2d Cir 2002).

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord*, 196 F.3d 132, 135 (2d Cir.1999).  However, courts have held that in order to constitute a physical injury under Section 1997e(e), an injury must be more than *de minimis*, but need not be significant. *Id*.  (citing *Siglar v. Hightower*, 112 F.3d 191, 193-94 (5th Cir.1997) (finding claim of bruised ear an insufficient physical injury to overcome bar of § 1997e(e)).  The dry, cracked skin and athlete's foot fungus alleged by plaintiff is not the type of "injury" contemplated by Section 1997e(e). *See, e.g., Dolberry v. Levine*, 567 F. Supp. 2d 413, 418 (W.D.N.Y.2008) ("Although plaintiff

---

[17] Given the procedural history of this case, the plaintiff has no realistic prospect of identifying and locating the unnamed and/or unserved defendants, assuming that he has the will to do so (which he has not demonstrated thus far).  Based on the information submitted in support of the summary judgment motion, it is equally doubtful that the plaintiff could or would gather any further information supporting his conclusory claim that particular defendants were personally involved in one or more of the alleged constitutional violations.

[18] Section 1997e(e) provides that:  "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

does allege that he suffered a skin rash due to the lack of showers, that is a *de minimis* injury that does not give rise to a claim.") (citing *Brown v. Pierce*, 05-1322, 2008 WL 619288, *5 (C.D. Ill. Mar. 4, 2008) (collecting cases); *Walker v. Dart*, 09 C 1752, 2010 WL 669448, at *3, 4 (N.D. Ill. Feb.19, 2010) (athlete's foot fungus is not an "injury" under Section 1997e(e)).   In any event, this court has concluded that plaintiff has not stated any viable constitutional violation that would support a claim for any relief.

## VIII.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims.  In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory in all cases").  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.  This court need not address qualified immunity with respect to plaintiff's against defendants Carlsen and Taylor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt.

33

No. 24) be **GRANTED** and the complaint be **DISMISSED IN ITS ENTIRETY.**

The Clerk is directed to serve this Report-Recommendation on plaintiff, not only at his address of record at Groveland Correctional Facility, but also at Attica Correctional Facility, 639 Exchange Street, Attica, New York  14011-0149–which, according to the DOCS web site, is where he is currently confined.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**Dated: August 16, 2010**

Hon. Andrew T. Baxter
U.S. Magistrate Judge

# EXHIBITS

**Exhibit A**:   EPA Guidance Manual, Turbidity Provisions, § 7.2 at p. 7-1, www.epa.gov/ogwdw000/mdbp/pdf/turbidity/chap_07.pdf.

**Exhibit B**:   EPA *Corrosion, Scaling, and Metal Mobility Research*, *Iron*, at p. 2, www.epa.gov/nrmrl/wswrd/cr/corr_res_iron.html.

**Exhibit C**:  "Q&A," by C. Clairborne Ray, *New York Times*, April 27, 2004,  www.nytimes.com/2004/04/27/science/q-a-368377.html.